UNITED STATES of America,
Plaintiff,

v.

THIRD NATIONAL BANK OF NASH-
VILLE and Nashville Bank and Trust
Company, Defendants,

and

the Comptroller of the Currency,
Intervenor.

Civ. A. No. 3849.

United States District Court
M. D. Tennessee,
Nashville Division.

Nov. 22, 1966.

See also D.C., 36 F.R.D. 7.

James L. Minicus, Robert C. Weinbaum, Daniel R. Hunter and Francis G. McKenna, Department of Justice, Washington, D. C., for United States.

Frank M. Farris, Jr., Farris, Evans & Evans, Henry W. Hooker and John Jay Hooker, Jr., Hooker, Hooker & Willis, Edwin F. Hunt, Boult, Hunt, Cummings & Conners, Nashville, Tenn., for Third Nat. Bank of Nashville and Nashville Bank & Trust Co.

James M. Saxon, Comptroller of Currency, Charles H. McEnerney, Joseph J. O'Malley and Franz F. Opper, Comptroller of the Currency, Washington, D. C., for Comptroller of the Currency.

## OPINION

WILLIAM E. MILLER, Chief Judge.

This action was instituted August 10, 1964 by the United States, acting through the Department of Justice, under § 4 of the Sherman Act, 15 U.S.C.A. § 4, and § 15 of the Clayton Act, 15 U.S.C.A. § 25, to enjoin the proposed merger of the Third National Bank in Nashville (Third National) and the Nashville Bank & Trust Company (Trust Company). Violations of § 1 of the Sherman Act, 15 U.S.C.A. § 1, and § 7 of the Clayton Act, 15 U.S.C.A. § 18, were charged in the complaint. Acting pursuant to the Bank Merger Act of 1960, 12 U.S.C.A. § 1828(c), the Comptroller of the Currency, notwithstanding adverse reports on the competitive factors involved from the Attorney General, the Federal Reserve Board, and the Federal Deposit In-

surance Corporation, approved the merger on August 4, 1964 on the basis of a written opinion and detailed findings of fact. Plaintiff's motion for a preliminary injunction was heard August 14 and 15, 1964; it was denied August 18, 1964; and the merger was consummated the same day. Before trial on the merits and after extensive pretrial proceedings in this action, Congress enacted Public Law 89–356, 80 Stat. 7, as an amendment to § 18(c) of the Federal Deposit Insurance Act, 12 U.S.C.A. § 1828(c). The Amendment, approved February 21, 1966 and referred to as the Bank Merger Act of 1966, effected material changes in the 1960 Bank Merger Act. By § 2(c) the Amendment was made applicable to pending antitrust actions involving bank mergers consummated after June 16, 1963. The significance of that date was that the Supreme Court of the United States then rendered its opinion in United States v. Philadelphia National Bank et al., 374 U.S. 321, 83 S.Ct. 1715, 10 L. Ed.2d 915, holding that the Bank Merger Act of 1960 did not, by directing the banking agencies to consider competitive factors before approving bank mergers, immunize mergers approved by them from later judicial challenge under the antitrust laws. Despite prior approval by the Comptroller of the merger of the second and third largest commercial banks in *Philadelphia,* the Court held the proposed merger to be forbidden by § 7 of the Clayton Act and such merger was accordingly enjoined. So, absent the 1966 Amendment, the Court's only task in this case would be to determine wheth-

er the merger now under scrutiny runs afoul of antitrust laws without regard to any of the banking factors enumerated in the 1960 Act. It is clear, however, that the Amendment introduces new standards to be applied by the banking agencies, by the Department of Justice, and by the courts alike. It reflects the congressional attempt to reconcile the judicial application of antitrust concepts with the standards applied by federal banking agencies in evaluating merger applications under the 1960 Act. By § 18 (c) (5) (B) of the Federal Deposit Insurance Act, as amended by the 1966 Amendment, it is provided that the responsible agency shall not approve any proposed merger transaction which shall violate the specified antitrust standards "unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." The Amendment then proceeds in the immediately following paragraph: "In every case, the responsible agency shall take into consideration the financial and managerial resources and future prospects of the existing and proposed institutions, and the convenience and needs of the community to be served."[1]

By § 18(c) (7) (B) it is provided that the "standards" applied by the courts in antitrust actions attacking bank mergers "shall be identical with those that the banking agencies are directed to apply under paragraph (5)", and by § 2(c), courts are directed to "apply the substan-

1. Sec. 18(c) (5) of the Federal Deposit Insurance Act as amended by the 1966 Amendment provides:

The responsible agency shall not approve—

(A) any proposed merger transaction which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

(B) any other proposed merger transaction whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

In every case, the responsible agency shall take into consideration the financial and managerial resources and future prospects of the existing and proposed institutions, and the convenience and needs of the community to be served.

tive rule of law set forth in § 18(c) (5) of the Federal Deposit Insurance Act, as amended by this Act" in all antitrust litigation pending before them on and after the date of enactment of the 1966 Amendment with respect to all mergers consummated after June 16, 1963, the date of the Supreme Court decision in *Philadelphia*.

 Thus from the terms of the Amendment as well as from its legislative history,[2] the basic congressional intent in enacting the 1966 Amendment appears to be clearly mirrored: Bank mergers must be examined and analyzed by the agencies and by the courts in terms of the antitrust standards prescribed in the Amendment, such analysis to include consideration of the enumerated special banking factors, and any violations of such standards shall constitute a barrier to bank mergers unless "clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." "In every case," as the Amendment explicitly provides, there shall be taken into account "the financial and managerial resources and future prospects of the existing and proposed institutions and the convenience and needs of the community to be served." The banking industry is thus recognized as occupying a unique place in our national economy requiring a specialized set of antitrust standards, and under prescribed conditions exemption from the operation of antitrust consequences altogether with the exception of those prescribed in § 18(c) (5) (A).

Before adverting to the merits of this case, it becomes necessary to resolve a problem of procedure. This problem arises because the Comptroller formally approved the merger prior to the 1966 Amendment and in the light of the factors of the Bank Merger Act of 1960. While the 1960 Act required him to consider anticompetitive effects, it did not require him to accord this factor any particular weight or to determine antitrust issues per se.[3]

In United States v. Crocker-Anglo National Bank et al., United States District Court, Northern District of California, 263 F.Supp. 125, a three-judge court rendered its opinion on October 6, 1966 in one of the three post Philadelphia cases pending at the date of the enactment of the 1966 Amendment in which mergers had been consummated after the *Philadelphia* decision. The other two pending cases were the present case and a case pending in St. Louis. Although mergers consummated before the *Philadelphia* decision were exempted from Sherman § 1 and Clayton § 7, the new antitrust standards of the 1966 Amendment were made to apply to all mergers consummated after that decision, including those challenged in the three pending cases, as we have seen. In *Crocker-Anglo*, as in this case, the Comptroller of the Currency had approved the merger prior to the 1966 Amendment by applying the different criteria of the 1960 Bank Merger Act. He had not assessed its validity under the standards of the 1966 Amendment. The California Court, pointing out that under § 18(c) (7) (A) courts are directed to "review de novo the

2. H.R.Rep. 1221, 89th Cong. 2d Sess. (1966), Bank Merger Act Amendment, U.S.Code Cong. & Admin.News 1966, p. 1860.

3. The 1960 Bank Merger Act applied to all banks insured by the Federal Deposit Insurance Corporation and banking agencies in considering merger applications were required to evaluate:
 (1) The financial history and condition of each of the banks involved; (2) the adequacy of its capital structure; (3) its future earnings prospects; (4) the

general character of its management; (5) the convenience and needs of the community to be served; (6) and whether or not its corporate powers are consistent with the purposes of this chapter * * * the appropriate agency shall also take into consideration the effect of the transaction on competition (including any tendency toward monopoly) and shall not approve the transaction unless, after considering all of such factors, it finds the transaction to be in the public interest. (12 U.S.C.A. § 1828(c) (1964).

issues presented" in actions under the 1966 Amendment, stated:

No difficulty would be presented here so far as reviewing *de novo* the first of these determinations for this court has traditionally adjudged whether mergers have anti-competitive effects. But the problem of reviewing the second determination by the Comptroller, namely, whether the proposed transaction is outweighed in the public interest, and whether it meets the convenience and needs of the community, is plainly and unquestionably a legislative or administrative determination of a type which this court, as a constitutional court, is prohibited from deciding.

Entertaining this view the Court construed the 1966 Amendment as limiting the Courts' role in pending cases as well as in all future cases to a review of the findings made by the Comptroller pursuant to the 1966 criteria. As there were no such findings by the Comptroller before the court in *Crocker-Anglo*, it was directed that the action be remanded to the Comptroller to update his findings and conclusions under and in the light of the new standards of the 1966 Amendment. It was intimated in the opinion that the court's power to review such findings as to anticompetitive effects would be somewhat broader in scope than its power to review the Comptroller's findings that anticompetitive effects are "clearly outweighed in the public interest," or as to what constitute the "convenience and needs of the community to be served". As to the latter, the courts would be restricted to a "determination of questions of law and ascertainment of whether findings of fact by the agency are supported by substantial evidence", taking into account not only the evidence before the Comptroller but also any additional evidence made a part of the record at the trial. The *Crocker-Anglo* interpretation of the 1966 Amendment as to the scope of the judicial function in the three cases pending at the time of its enactment is supported by a carefully reasoned opinion, although it must be conceded that the issue of statutory interpretation is not free from difficulty. In any event it is not deemed necessary in this action to follow the example of the California Court in remanding the action to the Comptroller for findings specifically formulated under the new criteria of the 1966 Amendment. In *Crocker-Anglo* the trial occurred before the effective date of the 1966 Amendment, and that court accordingly did not have before it any findings by the Comptroller assessing the merger on the basis of the newly enacted standards. Under such circumstances, it was the court's view that a remand to the Comptroller for updating his findings and conclusions was the proper and expedient course to follow. In contrast, the present action was tried after the 1966 Amendment and the Comptroller's assessment of the present merger under the new criteria and standards of the Amendment has been presented to the Court in various ways. First, having intervened as a party to the action under the provisions of the 1966 Amendment allowing such intervention as of right, (§ 18(c) (7) (D) of the Federal Deposit Insurance Act, as amended), he has filed a formal answer setting forth his views that the merger is not substantially anticompetitive when evaluated under the terms of the 1966 Amendment, and that any anticompetitive effects are clearly outweighed in the public interest by the convenience and needs of the community to be served. The same views and opinions have been presented to the Court by the Comptroller, acting through his attorney, at various stages during the trial, including the making of oral arguments, the filing of written briefs, and the filing of suggested findings of fact and conclusions of law to be approved by the Court. Of greater significance, however, is the fact that the Comptroller appeared as a witness at the trial and expressed the same views and opinions in response to numerous questions on direct and cross examination. His testimony convincingly demonstrated that he was entirely familiar not only with the new standards of the 1966 Amendment, but also with the

essential and material facts which had been developed at the trial. Like testimony was given by the Regional Comptroller of the Currency. There is no reason to conclude that these steps were not taken by the Comptroller in good faith. Nor are the Comptroller's opinions expressed as a witness under oath entitled to any less weight because he saw fit to intervene as a party in the action. If he concluded that the merger met the tests of the 1966 Amendment, as he obviously did, it was his right, if indeed it was not his duty, to intervene in the action to support that conclusion and to make his views, opinions and findings known to the Court.

■ The trial was a protracted one, extending over approximately six weeks and involving some 3,800 pages of transcript. A remand to the Comptroller could only serve the purpose of further delay. It is idle to suppose that any further significant evidence could be unearthed, or that the Comptroller would be likely to come to any different conclusion, or that he could have any better grasp of the controlling facts than he possessed at the trial. Since the purposes of a remand have been substantially accomplished in the manner indicated, and since the Comptroller's findings and opinions are before the Court under both the 1960 Bank Merger Act and the 1966 Amendment, the Court concludes that the remand procedure is not required.

■ What, then, is the scope of judicial review? Applying the rationale of the *Crocker-Anglo* opinion, the Court's review of anticompetitive effects should be broader than "public interest" and "convenience and needs." The banking agency's finding on the first issue should be accorded some weight in view of its expertise and the technical and complex nature of the banking industry, but since a violation of antitrust standards is primarily a legal issue which courts have traditionally considered they should make an independent determination with respect to it. On the other hand, since the question whether anticompetitive effects are outweighed in the public interest by the convenience and needs of the community is, in the language of the *Crocker-Anglo* opinion, "plainly and unquestionably a legislative or administrative determination * * *," the Comptroller's findings should not be disturbed unless they are unsupported by substantial evidence. This view finds strong support in the statement of the Supreme Court in *Philadelphia*, at p. 371 of 374 U.S., at p. 1745 of 83 S.Ct.:

> We are clear, however, that a merger the effect of which "may be substantially to lessen competition" is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. A value choice of such magnitude is beyond the ordinary limits of judicial competence * * *.

In seeking to void the merger under investigation the plaintiff relies upon Section 1 of the Sherman Act as construed in United States v. First National Bank & Trust Co. of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964), and upon Section 7 of the Clayton Act as construed in United States v. Philadelphia National Bank, supra. As in *Lexington* and *Philadelphia*, the plaintiff's case rests primarily upon inferences derived from statistics and upon the rules of prima facie invalidity enunciated in those cases. It is argued that the merging banks were "major competitive factors" in the relevant Davidson County market, that the merger resulted in the elimination of competition between them, and, consequently, that the case falls squarely within the ambit of the Supreme Court ruling in *Lexington* under Section 1 of the Sherman Act. A fortiori, it is argued that the merger is forbidden under the less stringent provisions of Clayton Section 7. It is further insisted, independently of the Sherman Act, that the merger must fall under Clayton Section 7 standards as delineated in *Philadelphia*, in that (a) the merger has produced a firm—controlling an undue percentage share of the relevant market, and (b) it has resulted in a significant increase in

the concentration of firms in that market. It is therefore said that the merger "is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." In this case the plaintiff says that there is no such countervailing evidence. Plaintiff also relies upon the statement in a footnote of the *Philadelphia* opinion that "if concentration is already great, the importance of preventing even slight increases in concentration * * * is correspondingly great." Plaintiff would drastically minimize the effect of the 1966 Amendment. Its position as to the impact of the Amendment is thus succinctly stated in its trial brief.

The 1966 Amendment did not change materially the tests of antitrust legality applicable in bank merger cases. The Act was designed primarily (1) to require the bank supervisory agencies to give more weight than heretofore to the competitive factor in ruling on future merger applications, (2) to remove any impression that the standards of Philadelphia and those of the Bank Merger Act of 1960 differ in fact, and (3) to make it clear that, as suggested in Philadelphia, limited recognition was to be given to the special features of commercial banking in terms of consideration of the "banking factors"—primarily a failing company doctrine with "somewhat larger contours," Philadelphia National Bank, supra, 374 U.S. at 372 n. 46, 83 S.Ct. at 1746.

Taking notice of the suggestions in the *Philadelphia* opinion that the failing company doctrine may have somewhat larger contours in the banking area, the plaintiff would construe the banking factors enumerated in the 1966 Amendment as being concerned primarily with the question of solvency and protection of the community against a failing bank. This is true, as the plaintiff insists, not only with respect to financial and managerial resources, but also with respect to the

concept of convenience and needs of the community.

The plaintiff's restrictive interpretation of the 1966 Amendment finds little support either in legislative history or in the text of the Amendment itself. On the contrary, both legislative history and the textual provisions of the Amendment strongly indicate that it was the intent of Congress to effect substantial changes in existing antitrust law relative to bank mergers as enunciated in the *Lexington and Philadelphia* cases. United States v. Crocker-Anglo National Bank et al., supra. After the decision in the *Philadelphia* case, the validity of bank mergers was made to depend in the final analysis, if challenged in the courts, upon the application of traditional antitrust standards. Except for the vague intimation that the failing company doctrine might have somewhat larger contours in bank merger cases, no consideration was to be given in an action challenging bank mergers under antitrust laws to the special banking factors contained in the 1960 Bank Merger Act. Essentially what the 1966 Amendment does is to change this ultimate test of validity from one depending strictly upon antitrust laws to a test balancing antitrust considerations with the special factors recognized by Congress as peculiarly applicable to the banking industry. The House Report on the 1966 Bank Merger Amendment clearly sustains this view. Under the heading, "What the Bill Would Do," it is stated that it would establish a single set of standards for the consideration of future mergers by the responsible banking supervisory agencies, the Department of Justice, and the courts under the antitrust laws—standards stricter than those in the Bank Merger Act "but which include both the effect on competition and the convenience and needs of the community to be served," a standard clearly different from that of the *Lexington* and *Philadelphia* cases.

It is pointed out under the heading, "The Need for the Legislation," that the committee had heard the contention made that banking is such a unique industry

and that the determination of where the public interest lies in a given bank merger situation requires such special expertise that any bank merger which has been approved by the appropriate federal supervisory agency should be absolutely immune from antitrust attack. On the other hand, the committee had heard the contention advanced with equal vigor that any bank merger whose effect would be to lessen competition should on that ground alone be absolutely prohibited, and that neither agencies nor courts should be permitted to examine the question of whether the overall effect of such merger might be in the public interest.

Under the heading "Purpose of the Bill," the floundering bank problem is discussed as follows:

Under general antitrust law criteria, particularly as they have been developed over the past few years, the banking agencies find it difficult to deal as they would like with the floundering bank problem in medium to smaller sized communities. The problem arises where there is a relatively small number of banks, and one or more of these banks appear to be stagnating. It may be because it is below the economic minimum size to attract capable and vigorous management personnel, it may be because it is closely held by owners who insist on unrealistically conservative policies, or it may be for any other reasons which are discernible only by an examination of that particular bank as an individual institution. The banking agencies, with some differences in degree among themselves, have contended that they should be able to consider a merger application on the basis of such an individual examination, and to approve it if they believe that the result would be a more vigorously competing institution, furnishing better overall service to the community, even though the reduction in the number of competing units, or the concentration in the share of the market in one or more lines of commerce, might result under general antitrust

law criteria in a substantial lessening of competition.

As to the intended legal effect of the Bill, the House Report proceeds:

First, it is intended to make clear that no merger which would violate the antimonopoly section (sec. 2) of the Sherman Anti-Trust Act may be approved under any circumstances.

Second, the bill acknowledges that the general principle of the antitrust laws—that substantially anticompetitive mergers are prohibited—applies to banks, but permits an exception in cases where it is clearly shown that a given merger is so beneficial to the convenience and needs of the community to be served—recognizing that effects outside the section of the country involved may be relevant to the capacity of the institution to meet the convenience and needs of the community to be served—that it would be in the public interest to permit it.

Third, the bill provides that this rule of law is to be applied uniformly, in judicial proceedings as well as by the administrative agencies.

Turning to the text of the 1966 Amendment, it becomes even clearer that bank mergers are sui generis, to be assessed as to anticompetitive effects not alone on the basis of the quantitative analyses of the *Lexington* and *Philadelphia* cases, but, in addition, by taking into account all material factors with respect to each institution in the setting of the relevant market, and by evaluating the special banking factors delineated in § 18(c) (5) (B). By that section, as we have seen, not only may anticompetitive effects be outweighed by the convenience and needs of the community to be served, but responsible agencies and courts alike are mandated to take into consideration "in every case" the following special factors:

(1) Financial resources of the existing and proposed institution;

(2) Their managerial resources;

(3) Their future prospects; and

(4) The convenience and needs of the community to be served.

There is nothing in the language of this section to indicate that the special banking factors were to be given limited recognition only, or that they were to be concerned primarily with the question of solvency. It is clear that the factors embrace the problem of the failing bank as well as that of the "floundering" or "stagnating" bank. Certainly possible insolvency is an important consideration, but it may be of equal importance to the economy to eliminate a bank which has reached a point of deterioration or stagnation and to permit its merger with a "more vigorously competing" institution. Are the cases of floundering banks the "somewhat larger contours of the failing company doctrine" to which plaintiff refers? The answer from legislative history justifies an affirmative answer.

Nor does the language of Section 18(c) (5) (B) support the thesis that agencies and courts in considering anticompetitive effects in bank merger cases are to be hamstrung by cold statistics and are not to be allowed to look to the total facts in context to determine whether the statistics reflect the true competitive situation.

Mr. Justice Harlan, dissenting in the *Lexington* case, expressed the view that Congress in the Bank Merger Act of 1960 had plainly indicated that it did not intend that mergers in the banking field should be measured solely by the antitrust considerations which are applied in other industries. He further stated that adherence to the principles enunciated in United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533,[4] "would leave room for an accommodation within the framework of the antitrust laws of the special features of banking recognized by Congress." Because of the ruling in *Philadelphia,* this accommodation was not effectively accomplished by the 1960 Bank Merger Act, but the Court is persuaded that the accommodation to which Mr. Justice Harlan referred is the fundamental purpose and effect of the 1966 Amendment in providing that anticompetitive effects may be outweighed in the public interest by the convenience and needs of the community, and that consideration shall be given in every case to the qualitative banking factors specifically enumerated. These factors are sufficiently comprehensive in character not only to embrace the *Columbia Steel* criteria, but also to require an even broader scope of inquiry and analysis with respect to antitrust issues.

The Court's construction of the 1966 Amendment is supported by the Amendment's provision that bank mergers shall be considered in the first instance by the responsible banking agency, applying the standards of Section 18(c) (5), by the requirement that courts shall apply identical standards, and by the provision that the Courts' role shall be limited to reviewing de novo the issues presented under the 1966 Amendment. If it was the purpose of the Amendment simply to perpetuate without modification the *Lexington* and *Philadelphia* antitrust criteria in the banking field, it is not apparent why Congress would have emphasized by these provisions the importance of the responsible agencies' expertise with respect to bank mergers. The structuring of the Act in this respect cannot be reconciled with the logic of the *Philadelphia*

---

4. These principles were stated in the Columbia Steel opinion as follows:

In determining what constitutes unreasonable restraint, we do not think the dollar volume is in itself of compelling significance; we look rather to the percentage of business controlled, the strength of the remaining competition, whether the action springs from business requirements or purpose to monopolize, the probable development of the industry, consumer demands, and other characteristics of the market. We do not undertake to prescribe any set of percentage figures by which to measure the reasonableness of a corporation's enlargement of its activities by the purchase of the assets of a competitor. The relative effect of percentage command of a market varies with the setting in which that factor is placed. At page 527, 68 S.Ct. at page 1124.

decision that courts must determine the validity of bank mergers on the basis of antitrust considerations alone—primarily derived from statistics—independently of and without regard to the special features of banking recognized by Congress. Whereas under the *Philadelphia* rationale, courts determined anticompetitive effects without regard to banking factors and banking agencies determined both, a balanced consideration of anticompetitive effects and banking factors is now enjoined upon both agencies and courts, the agencies speaking first and the courts reviewing "de novo" the issues presented.

 Entertaining these views as to the thrust of the 1966 Amendment, the Court is of the opinion that while the plaintiff has established an arguable case for condemnation of the merger under the pre-1966 standards of the *Lexington, Philadelphia* and other cases, treating Davidson County as the relevant geographic market and commercial banking as the services or products market,[5] the merger is not violative of the new antitrust standards of the 1966 Amendment.

The term "arguable case" is used for the reason that there are at least some conspicuous points of difference between the case at bar and *Lexington* and *Philadelphia,* whether or not such differences are of controlling significance. In the *Lexington* case, the Supreme Court held

invalid under Section 1 of the Sherman Act the consolidation of the first and fourth largest commercial banks in Fayette County, Kentucky. Before the consolidation the largest bank, First National, had approximately 40% of the assets, deposits and loans in the relevant market which was determined to be Fayette County. The fourth largest bank, Security Trust, before the consolidation had approximately 12% of the assets, deposits and loans. After the consolidation, the new bank, First Security, had approximately 52% of the assets, deposits and loans. The bank established by the consolidation was larger than all of the remaining banks combined. In addition to these statistics reflecting "bigness," the Court relied upon the testimony from three of the four remaining banks that the consolidation would "seriously affect their ability to compete effectively over the years." It was concluded that the two banks before the consolidation were major competitors and that the elimination of significant competition between them constituted an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. The statistics of the present case, of course, are not as impressive as those in *Lexington.* Third National, having approximately 33% of assets, deposits and loans before the merger, possessed approximately 38% in these categories after the merger. It was second in size before the merger

5. The Court rejects the defendants' and intervenor's argument that in assessing the anticompetitive effects of the merger the relevant geographic market is the broad area served by Third National's correspondent banking system. There is no significant legislative history to support the view that the 1966 Amendment was intended to change the relevant geographic market concept as developed in antitrust law. The Court is of the opinion under the facts of this case that the relevant geographic market is Davidson County. This is "where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." United States v. Philadelphia National Bank, supra, 374 U.S. at p. 357, 83 S.Ct. at p. 1738. Also, on the

clear preponderance of the evidence in this case the appropriate "line of commerce" by which to appraise the competitive effects of the merger is the cluster of products and services denoted by the term commercial banking. The Court does not agree that the omission of the words "in any line of commerce" from the 1966 Amendment is indicative of a congressional intent to reject "commercial banking" as a distinct line of commerce in appraising anticompetitive effects. It cannot be presumed that such an important change in established antitrust law would be made by mere omission. Again, there is really no significant legislative history to support the defendants' and intervenor's position on this point.

and it retained the same position in the Davidson County market after the merger. The Trust Company's share of assets, deposits and loans before the merger was only approximately 5% as compared with the 12% of the smaller bank in *Lexington*. There is no comparable testimony in the present case from any of the remaining banks in Davidson County that the consolidation will seriously affect their ability to compete effectively. In *Philadelphia* a 30% market share resulting from the merger was regarded as undue, as compared with approximately a 38% market share in the present case; but in *Philadelphia* the merger resulted in a 33% increase in concentration between the two largest banks; whereas the increase in the present case between the three largest banks is approximately 5%. The *Philadelphia* merger formed a bank which became the largest in the market area; whereas, in this case, as pointed out, the new banking institution will continue to occupy second place. In *Philadelphia* neither of the banks involved had antitrust clean hands—the Philadelphia National having acquired nine formerly independent banks and Girard having acquired six, such acquisitions having extended over a long period of time into the recent past. In the case at bar, there is no significant merger history either with respect to the two banks or in the Davidson County commercial banking market.

Other differences could be pointed out, but it is clear to the Court that whatever the result in this case may have been before, the merger now under consideration does not run afoul of antitrust standards when evaluated in the terms of the 1966 Amendment, as the Court construes it.

The Trust Company was chartered in 1889. Its name was changed in 1956 to Nashville Bank & Trust Company. It opened its only branch in 1959. Prior to the change of ownership in 1964, the controlling interest in the Trust Company had been owned by H. G. Hill, Jr. and his retail grocery chain operating in the Middle Tennessee area. The institution had been operated primarily as a trust company [6] with commercial banking occupying a place of secondary importance. In 1956 it brought in a former railroad executive, W. S. Hackworth, as president and began to emphasize the commercial aspects of its operation. During the period from 1955 to 1964 its assets, deposits and loans more than doubled, and its earnings record was good. This rate of growth, however, leveled off about the year 1960. From that time until the merger with Third National its rate of growth was markedly less than that of any of the other banks in Davidson County. For the period 1956–60 its rate of growth in total assets was 46.55%, a figure which dropped to 20.32% for the period 1960–64. For the same periods the drop in deposits was from 50.58% to 18.77%, and the drop in total loans and discounts was from a percentage gain of 77.57% to 29.86%. Its percentage of total banking business in the market declined from 5.72% on June 30, 1960 to 4.83% on June 30, 1964.

The evidence demonstrates conclusively that the Trust Company, when considered as a commercial bank, has not been an innovator or an aggressive competitor. Its operations have been dominated by unaggressive and ultra-conservative management policies. At the time of the merger and for many years prior thereto it had a serious lack of

6. The Trust Company had created and maintained what was for the most part a good trust department, an aspect of its operations which need not be discussed in detail herein. Trust departments, as the evidence shows, are operated primarily as a service to bank customers and are not an important lever in obtaining commercial business. While there is some direct competition for trust business in the market area between commercial banks having trust departments, such competition is minimal. The greatest area of direct competition for trust business is not with other banks but with individuals, such as lawyers. The loss of a trust account to a competitor bank is of infrequent occurrence.

managerial resources due primarily to the fact that its salary scale was wholly inadequate and it was without a funded pension plan for its employees. As pointed out by the Comptroller of the Currency in his decision approving the merger on August 4, 1964, "a bank is only as good as its management." At that time the 68 year old bank president was seriously ill and anxious to retire, having an illness which has since caused his death. H. G. Hill, Jr., Chairman of the Board, had sold the controlling stock interest in the Trust Company, owned by his grocery firm, the H. G. Hill Company to William C. Weaver and associates, and resigned from the bank's board of directors. Kirby Primm, the bank's only full time business solicitor, had resigned and taken a position with the First American National Bank, the largest bank in the market area. All three of these men had been key factors in the growth which the bank had enjoyed during Hackworth's tenure as president, and it is no exaggeration to say that so far as the Trust Company's commercial business was concerned they were practically irreplaceable. Much of the new business was brought to the Trust Company due to the formidable influence and personal business connections of Hill and Hackworth. Primm had been exceedingly resourceful in soliciting new business, particularly in capitalizing upon firms which did business with the Hill grocery stores. The decline in the bank's rate of growth is attributable in large measure to the loss of two of these individuals, to Hackworth's declining health, and to the lack of branch banks and other necessary facilities. In addition, both Hackworth and Primm testified that the Trust Company had reached a plateau and that they had gone as far as they could in bringing in new business by soliciting their friends and business connections. Hackworth described the bank's dilemma as follows:

> The earnings of Nashville Bank and Trust Company in the immediate past have been satisfactory. However, if the Nashville Bank and Trust Company

made the expenditures necessary to bring it into a position to compete successfully and substantially in the Nashville area banking industry, such as additional branch banks, increased salary scale, automation, funded pension plan, employee welfare benefits and other related modern banking methods and procedures which have come to be necessary in order to render adequate and modern service to the public, it is certain that its pattern of satisfactory earnings could not be maintained and such earnings might very well disappear.

The evidence demonstrates that the Trust Company management problem was one of serious proportions which made it practically impossible to attract and hold competent young men. It is significant that during his 17-year tenure at the Trust Company Primm's salary had increased by only 45% above a very low beginning, and that First American offered him an immediate salary increase of 60%.

The Trust Company's lack of dynamism and aggressiveness is demonstrated in many other ways. There had been no change in department heads from 1946 until the merger in 1964, a situation hardly calculated to interest young managerial leadership. Many of its officers and board members were old and the bank was in serious need of qualified young men as replacements. Although the Trust Company, due primarily to the personal business relationships of Hackworth and Hill, was able to grow substantially during the early years of Hackworth's tenure, no substantial or concerted effort was made to improve or modernize its methods, facilities, attitudes or personnel and management policies. For example, it consistently had the lowest loan to asset ratio of any bank in Davidson County, its loans being confined primarily to real estate and secured loans as distinguished from short term commercial loans. It operated without the benefit of credit files or a credit department. It employed no credit specialists. In conse-

quence it was not able to handle indirect consumer loans or the larger, more complicated credit situations. Its loss experience, particularly in recent years, had not been good. Its emphasis was consistently upon profits rather than upon making the expenditures necessary to place itself in a posture to be truly and significantly competitive. In addition to inadequate salaries, the lack of a funded pension plan and low fringe benefits, it failed to provide branches, the hallmark of modern banking. It had only one branch as of the date of the merger in the Davidson County market in which there were 52 branch banking offices. Nor did it provide modern equipment, modernized banking quarters, or a continuous audit program. It was not a member of the Federal Reserve system and it had no regular customer call program.

Capital City Bank, on the other hand, which had only begun operations in 1960, and being less than one-fourth the size of the Trust Company, had established three branches. The Comptroller of the Currency was of the opinion that the Trust Company could have established from eight to ten branches in Davidson County if it had so desired. He stated that its failure to branch indicated that it was not disposed to make the needed struggle indicated for growth. Its failure to have any automated or computerized equipment stands in contrast with most other banks of its approximate size in Tennessee. There were many other indicia of negative and unprogressive management policies, including its failure to remedy serious problems in the credit department despite warnings by the FDIC Examiner, its high proportion of criticized loans as reflected in FDIC reports, and its failure to hold any officer staff meetings since 1962.

Considering the Trust Company's problems, deficiencies and weaknesses, it is not difficult to understand the Weaver group's decision to merge with Third National rather than to undertake the formidable task of negotiating another sale, or the even more formidable task of solving the bank's many problems directly. The Weaver group had purchased the controlling stock in the Trust Company in the early part of 1964 as an investment. The members of the group had had no previous banking experience and none of them had planned to become members of the Board of Directors, or to devote their full energies and resources to rebuilding the bank. Fully realizing the extent of the bank's operational problems and difficulties only after the purchase, and realizing that the bank could not be revitalized as a competitive factor in the market without the expenditure of large sums of money, it was their conclusion that the best solution was to take the merger route.

In view of this attitude on the part of the new management, the Comptroller of the Currency correctly concluded in his decision approving the merger that "when a bank, such as the merging bank, is not disposed to compete, it is idle to speak of the elimination of competition by reason of the merger." Despite its growth record in Hackworth's early years as President, the future prospects of the bank at the time of the merger may be described as unpromising. While there is some conflict, the preponderance of the evidence is that it would have been practically impossible within any reasonable period of time to obtain adequate managerial replacements either from within the bank or from the outside, a product of the bank's failure to have adequate personnel and management policies, of its overly conservative attitudes, and of its failure to make the necessary expenditures to provide itself with the facilities, procedures and equipment required to maintain a competitive posture.

Only a brief word need be said concerning Third National and its position in the relevant market. There is no dispute in the record that it had been a strong, dynamic and aggressive bank, since its organization in 1927. It was characterized by the Comptroller of the Currency in his testimony at the trial as one of the strongest and best managed

banks in the nation. Of particular significance is the fact that its steady and impressive growth between 1927 and 1964 had been entirely the result of internal expansion, having no prior history of acquisition of assets by merger or consolidation. It had, in addition to its main office, some 14 branch offices in Davidson County. It has been active in the correspondent banking field, having approximately 365 correspondent bank accounts prior to the merger, most of which are located within a radius of 250 miles. Prior to the merger in 1964, it had total deposits of $315,090,000.00 as contrasted with the largest bank, First American National, with deposits of $371,108,000.00, and Commerce Union, the third largest bank, with deposits of $202,624,000.00. At that time the Trust Company had total deposits of $45,471,000.00, occupying fourth place in the market. The fifth largest bank, which had entered the market only four years previously, Capital City, had deposits of $7,266,000.00. The other three banks in the market were the Bank of Goodlettsville with deposits of $6,369,000.00; Citizens Savings with deposits of $3,053,000.00; and Whites Creek Bank with deposits of $2,603,000.00. After the merger all the Davidson County banks continued a substantial growth. As of June 1965, Third National had total deposits of $375,063,000.00; First American National had $393,040,000.00; Commerce Union had $219,514,000.00; and Capital City had $8,954,000.00. The remaining three banks had increased their combined deposits of $12,025,000.00 before the merger to $13,590,000.00.

When the general characteristics of the Davidson County market are considered, the plaintiff's insistence that the market is unduly concentrated appears to be lacking in significance. At the time of the merger all of the eight Davidson County banks had combined assets of slightly less than one billion dollars. In such a relatively small banking market it does not appear unreasonable that there should be a concentration of approximately 93% of combined assets in three banking institutions, this figure being approximately 97% after the merger of the Trust Company and Third National. The record contains figures for comparable southeastern markets competitive with Nashville and having three major banks holding between 90 and 100% of the loan and deposit business. For example, Chattanooga has concentration among three banks of 100%; Mobile, Alabama, 98%; Birmingham, Alabama, 93%; Jackson, Mississippi, 98%; Memphis, 91 to 92%. The three largest cities in Tennessee—Memphis, Nashville and Knoxville—are now served by only seven banks, the largest number for any Tennessee city.

A meaningful fact in this case is that the Davidson County banks have attained their present market shares and size through internal growth and not through acquisition, a fact which is in marked contrast with the situation which prevailed in the *Philadelphia* case, as already pointed out. Another distinctive characteristic of the Davidson County market is that it is highly competitive at all levels, a fact which is clearly established by the preponderant testimony of competent and knowledgeable expert witnesses and by objective evidence of low service charges. Rivalry for business has always been exceptionally keen. The ease of entry is clearly indicated by the case of Capital City Bank which entered the market in 1960 and has had a substantial and continued success. There is no evidence of oligopolistic behavior in the relevant market. On the contrary, that the Nashville banks are keenly competitive with respect to service charges, the solicitation of business, and in making changes and innovations is the only fair and reasonable conclusion which can be drawn from the record.

If the *Columbia Steel* factors, relegated to a place of relative unimportance in the *Lexington* case, are considered to have been restored to grace with respect to bank mergers by reason of the 1966 Amendment, and the Court is convinced that they were, and if the present case is accordingly analyzed in terms of such

factors, it seems clear that the plaintiff's position in this case cannot be sustained. On the present record, only the *Columbia Steel* factors dealing with size can arguably be said to favor the plaintiff's position. It may be conceded for present purposes that the *dollar volume* and *percentage of business controlled* are significant. But the *strength of the remaining competition* is clearly established in this case by the assets, deposits and loans of the seven banks in the Davidson County market remaining after the merger, and by competent testimony of bank experts familiar with the market, that the remaining banks were active, vigorous and highly competitive. There is also convincing testimony that the merger has actually resulted in an intensification of competition among the Davidson County banks. Of importance in this connection, as already stated, is the fact that all banks since the merger have had substantial growth. The *motive* for the present merger was not predatory, but was based upon an evaluation of business and economic factors. A merger with Third National was determined to be the best solution to the grave problems confronting the Trust Company at the time of the merger. Without the merger these problems could not have been solved without drastic expenditures over a protracted period of time. Finally, the preponderance of the evidence in this case with reference to the *probable development of the industry, consumer demands* and *other market characteristics*, is highly favorable to the merger. The Davidson County market has had no merger history; there is no trend toward concentration; the service area is rapidly growing with consumer demands being on the increase and the market being recognized as one of the most highly competitive in the nation; the remaining banks are well managed under vigorous and dynamic leadership; the Trust Company had reached a stagnant and deteriorating posture at the time of the merger, having critical managerial and other problems and deficiencies; the new owners were investors who were not disposed to make the sacrifices necessary to overhaul the bank so as to place it in a position to be substantially competitive with other banks; and actual or probable future oligopolistic behavior is refuted by the record. This analysis, notwithstanding the concentration and market share figures upon which plaintiff relies, compels the conclusion that the present merger is not a transaction "in restraint of trade" and consequently not prohibited by Section 18(c) (5) (B) of the Federal Deposit Insurance Act, as amended by the 1966 Amendment, the analogue of Section 1 of the Sherman Act.

Similar considerations lead to the conclusion that the effect of the present merger will not be "substantially to lessen competition, or to tend to create a monopoly" in violation of Section 18(c) (5) (B) of the Federal Deposit Insurance Act, as amended by the 1966 Amendment, the analogue of Section 7 of the Clayton Act.

As already stated, no reliable extrapolation as to future prospects may safely be predicated upon concentration or market share figures alone. But considering the totality of facts as to the institutions involved and as to the relevant market, a conclusion that the merger may substantially lessen competition in the future is wholly unwarranted. Any other view would require the Court to close its eyes to facts which are far more convincing than any possible contrary conclusions which could be drawn from the market share or concentration statistics in this case.

The Court concludes that the Comptroller of the Currency's findings, made both before and after the passage of the 1966 Bank Merger Act, that the anticompetitive effects of the merger are minimal and that the merger is not violative of antitrust standards, is supported by the clear preponderance of the evidence in the record. As the Court is also of this view independently of the Comptroller's findings, and concludes that the merger does not violate the antitrust standards of the 1966 Amendment,

it is unnecessary to inquire whether any anticompetitive effects are outweighed by the convenience and needs of the community. However, the Court is of the opinion that the preponderance of the evidence supports the Comptroller's finding that the convenience and needs of the community and the public interest will be far better served by Third National Bank with the additional assets which it acquired as a result of the merger than would be the case by maintaining the Trust Company as a separate institution. The Trust Company had simply reached a period of imminent deterioration. It was at the time of the merger a "floundering" bank, though not a failing one. It was no longer capable under its existing ownership and management, and with its existing facilities, procedures, and attitudes to serve the public on a competitive basis with other banks in the market area. It was more attuned to the Victorian age which gave it birth than to the competitive realities of 20th Century commercial banking.

The Court will presently enter and file with the Clerk detailed findings of fact and conclusions of law to implement and supplement this opinion. Pending such filing, entry of final judgment denying the relief sought by the complaint will be withheld.